This is an action to recover from defendant damages for personal injuries which the plaintiff, a flagman of defendant company, suffered when he fell from a platform in the town of Weldon, N.C. while he was engaged in the performance of his duties as an employee of the defendant.
The complaint of plaintiff is fully set forth in Batton v. R. R.,210 N.C. 756. The plaintiff set forth in his complaint the cause of action *Page 258 
in detail, and his permanent injuries and demand for damages. The defendant admitted paragraphs 1, 2 and 3 of the complaint, and said: "(4) So much of paragraph 4 of the complaint as alleges that `on 18 April, 1934, the plaintiff, being then engaged in the employment of the defendant as a flagman on the passenger train from Richmond, Va., to Florence, S.C., was ...... such flagman when said train on its southbound trip from Richmond to Florence, being engaged in interstate commerce, arrived at the town of Weldon about 2:15 a.m.' is admitted. The remaining part of said paragraph and each allegation thereof is denied. (5) Paragraph 5 is stricken from the complaint by the clerk, on defendant's motion, for irrelevancy and redundancy, under C. S., 537. (6) Paragraph 6 of the complaint and each of its subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), and (j) is denied. (7) Allegations of paragraph 7 of the complaint are denied. (8) As to the allegations of paragraph 8 of the complaint, defendant has no knowledge or information sufficient to form a belief, and therefore denies the same."
The defendant denied negligence and alleged that plaintiff's own negligence contributed to his injury; that plaintiff's own negligence was the sole proximate cause of his injury, and that plaintiff assumed the risk of his injuries. Upon motion of defendant, the following words were stricken from the complaint: In paragraph 4, "passenger and," "passenger and," "either passengers or," "passengers alighting from defendant's train and," and "passengers or," etc. These were stricken out throughout the entire complaint.
The evidence of plaintiff was to the effect that he was 57 years old, lived in Richmond, Virginia, and was an employee of defendant as a passenger train flagman. He had been in the employment of defendant 26 years and passenger flagman 15 years or more. His wages were about $200.00 a month. About 2:15 a.m. on 18 April, 1934, he was performing his duties as flagman on passenger train No. 83, going south from Richmond, Va., to Florence, S.C. It was a local train, had 18 cars and a private car on the rear for Charleston, S.C., which had Yale locks on the inside and he hand no way of getting into that car. His duties required him to protect the rear of the train when it reached the station at Weldon. He was riding ahead of the private car, could not go through the same and had to get down on the platform to go back to perform his duties in protecting the rear and to look over for brakes dragging, hot boxes or damage that could not be observed from the front of the train. He could smell a box if he got close to it, and if he had a light he could detect brakes rigging down or dragging. He had to go outside the car to detect such defects and would have to go to the rear of the train. Marker lights, one on each side to indicate the rear of the train, and he had to see that the markers were burning and adjusted *Page 259 
to the track, that is, keeping them straight back — red lights to the back, yellow to the front and side.
Plaintiff testified, in part: "On this particular occasion one of the markers was twisted around, and that is what I was going to adjust when I went back. Also I had to see that the steam in cold weather was blown out every 10 or 15 miles. At that time we had a rule to blow out the steam every 10 to 15 miles. I am pretty familiar with the rules which were in force at that time. I hold in my hand book entitled `Rules and Regulations of the Operating Department of Atlantic Coast Line Railroad Company.' Rule 908, page 113, says: `Special Duties to Protect.' That is the period rule of the company and was furnished me by the company for my guidance and instruction. It was very dark and rainy when the train reached Weldon at 2:15 a. m. The train was about an hour late. I had duties to perform at the rear of the train in respect to the valves. I had to blow the steam out; that was my duty. My next stop was at Rocky Mount, N.C. which was a terminal where they switched the train and detached the engine. Q. Was there any other place between Weldon and Rocky Mount that you could attend to the valves other than Weldon? Answer: No, that was the only place. My duties at the station with respect to inspection of the valves were that I always blow steam out of the rear of the train when it stops at a station. Weldon was a regular stop. The engineer gave the regular stop signal as we approached Weldon — one long blast of the engine, but the cord was not pulled because it was a regular stop. Q. State whether or not there was any custom, regular custom, as to stopping place for this train upon the platform at Weldon. Ans.: This specific train was always a short train, hardly ever over 15 cars; never carried a long train, and was carrying an unusually long train, because with local trains it is hard to make time. There were 19 cars on this train. Q. State whether there was a custom with respect to where the local train stopped upon the platform. Ans.: Always clear of the platform. I had been operating over that road 26 years, and I had hardly ever operated on trains of 18 of 19 cars except on the tourist trains. I had operated with trains with 19 cars very frequently in the tourist season, but never had occasion to get off. Those trains did not stop at Weldon. Q. Had you had occasion to have a train of 19 cars to stop at Weldon? Ans.: I cannot recall having one that did not clear the platform. Q. What was the custom with respect to all the trains that you had had experience with, with respect to stopping on the platform? Ans.: I said all trains I went on that stopped at Weldon, but the longest trains that I rode or did not stop there. Q. And was that the custom, the regular custom, with respect to trains which stopped at Weldon to stop on the platform? Ans.: It was. Just as soon as the train stopped *Page 260 
on the 18th of April I turned the valve on the third car from the rear and walked back to the rear of the train, the two cars I rode ahead of, with intention of blowing the steam out of the two cars in the rear and to straighten my markers so that when I got to Rocky Mount I could open the valve on the third car and blow the steam out of the whole train. That was my duty. There were no lights at the rear of the platform at all, I should say, for 5, 6, or 8 car-lengths, there were no lights; only where the passengers got off the train was lighted at the time. The only place there were any lights at all was just about where the passengers get off the day coaches and Pullmans. That was at the wide part of the platform near the station, and was more than 1,000 feet from the north end of the platform. As I went toward the rear of the cars I went along inspecting the train, and went back to adjust my markers and blow out the steam, and I had no idea I was anywhere near the end of the platform and I walked off the platform before I realized it. It was dark and rainy and I never touched a thing when I walked through; no barricade or anything to protect. While I was walking to the rear I was actually engaged in inspecting those two cars while walking along. I had a lantern with me. Those lanterns give a light about as big as your finger. The purpose of those lanterns was only to give signals and not to light up. They did not have any capacity for lighting up. At the end of the platform, to prevent my getting off next to the train, there was one 12-inch board and one 2 x 4 running down as a brace in the corner, and a space of three feet from the brace to the track unprotected. That brace was right at the end of the platform; so was the board. Before I reached the extreme end of the platform, there was no barrier or guard. There was no marker of any kind at the footboard to indicate where the edge of the platform went off. There was no warning whatever. The platform I refer to is on the south side of the river. The platform is an approach to the station. Trains come across the river from the north on this high trestle and into the station at Weldon. The north end of the platform is to walk on and it is supposed to be there to go around and inspect the trains. None of the train crew, except the flagman, has to get off there back at that part of the train. The train crew gets off at the wide part of the station except the flagman. I think the platform is about 1,000 feet long from the station. Q. How much space at the north end of the platform was there that was entirely open? Ans.: Three feet; I measured it; three feet was unprotected altogether. That is the space that was adjacent to the train and alongside of the train. I made that measurement since they reconstructed it, but I have looked at it lots of times before that. In passing over it and from general view you could surmise, but I did not measure it until since. . . . Between the 2 x 4 and the track *Page 261 
there is a space you can walk through without even touching anything. I did not touch thing. . . . There was no obstacle of any kind to impede my progress or stop me until I got to the north end of the platform. . . . The end of the platform was about 60 feet above the ground below. Falling felt like a thousand feet. When I stepped off the end of the platform I fell to the ground below in a sitting position. The ground was the first thing I struck. I do not think that, under the conditions that were then obtaining, I could distinguish three feet ahead, as dark as it was and raining. This was the main track and was the track over which all trains coming from the north had to travel in order to get through Weldon. I would think that the car was hanging over the end of the platform, maybe 10 or 12 feet; that much of the car was beyond the end of the platform. I was walking along the east side. . . . Rule 913, page 114, `Rules and Regulations of Operating Department of Atlantic Coast Line R. R.,' which reads: `Flagman must take care of the markers and other rear train signals, put them in place, see that they are properly displayed, and that the signal lamps are clean, trimmed, burning brightly, and that the markers are kept adjusted to the track.' . . . When I got on the train in Richmond I got on the third car from the rear after I put my markers on. I rode in that car because the rear car was a private car and the next to the rear car was a deadhead. The private car was the end car that I could not get in. I did not see the conductor after he showed me orders at Broad Street Station in Richmond. . . . After I fell and struck the ground it knocked the breath out of me, and as soon as I regained enough strength I crawled out of the hole I made in the ground and found that I had broken my white lantern and put my red lantern out, so I lighted my red lantern and crawled up almost 12 feet or as far as I could to attract attention to the red lantern. Then I got exhausted and laid down and could not turn over and in that position they found me at 7:45. I fell at 2:15 and they found me at 7:45. . . . They put me on a train and took me to South Rocky Mount Hospital, where I stayed for five months and five days the first time, then for three months, then for one month; almost continually going back and forth, and have to be under the doctor's care now. My back was broken and seven ribs. I fell in a sitting position and my knees drove up in my stomach and upset my bowels and bladder. . . . After this fall on 18 April, 1934, I have had no control of my bladder or my bowels, and I have to take purgative medicine every third day or I never have any bowel movement, and when I do I do not have any more control over them than a baby. I have to wear an urinal bag and have to use an urinal at night. That is attached to me in the daytime and at night I take it off and use an urinal pan. When my bowels are loose I have no control over them, just like a baby. *Page 262 
Of course, I suffer all the time with my back in two places and my intestines are always sore and aching, and especially in damp weather. Prior to 18 April I had no difficulty of this kind whatever."
On cross-examination plaintiff testified, in part, as follows: "Out of the 15 or 16 years in the service I would say that I was on 80 and 89 about three years, including trains 33 and 34. They also stopped at Weldon. 89 and 80 made ten round trips a month. In other words, I passed through Weldon 20 times each month and got off on that platform 20 times each month for three years; according to your figures, I got off on this platform 720 times in three years when running those two sets of trains. I have not figured it up. I am not disputing your figures. 83 and 82 were both night trains. 89 and 80 were both day trains. I got off on the platform at Weldon every time I came in there on 89 and 80. On 89 I would come in from the north and get off at the end of the trestle but we had short trains. I would get off 7 or 8 cars from the end of the trestle. I would get off and knew that the trestle was a high trestle above the ground. . . . I did not run on 82 and 83 very long. I was on the Florida Special when they cut that off, and I went back to 82 and 83. I rode the Florida Special only the last three years; the other times I was riding 83 and 82, and I was on a short run between Richmond and Petersburg for a long time. I would say that I ran from Richmond, Va., to Florence, S.C., on 82 and 83 not over two years. That would be 480 times I got off, one-half at the north end and one-half at the south end of the platform at Weldon. The Florida Special did not stop at Weldon; 83, 82, 89, 80, 33, and 34 were the trains I stopped on at Weldon. They always stopped at Weldon; 33, 34, 89, and 80 stopped in the daytime, the others at night. . . . When I got off the car I was the third car from the rear. I think the standard cars are 50 or 60 feet long. I never measured one. That would put me 150 or 180 feet from the rear of the train. I got off the rear end of the third car and started on back to the rear of the train. I was looking the train over, inspecting it for the purpose of seeing whether there was a hot box. I could smell a hot box when walking along, but could not when riding ahead. There are 8 boxes on each car, on the new cars. I did not see any hot boxes. When I was there looking at the boxes on the rear I was looking underneath to see if there was anything needed fixing. That was what I was doing when I stepped off the platform. That is what I had been doing since I stepped off the train and started walking to the back of the train. There were no lights in about four car-lengths of the rear end of the platform. There had been lights all the way back, but they had burned out or fallen out and when they were there they were very small lights. There were poles there, but no lights. There were no lights on the last three poles. Within 50 feet of the rear *Page 263 
of the platform there is a pole for a light, but there was no light. I know there was no light because I looked back, and there were no lights. I looked back when I was stopping. I looked up to see if there were any lights, and the last three poles did not have any lights, I saw that that night. I could not say exactly how many nights before the lights had been out. I would say approximately one month or two."
Redirect examination. "Q. At the time that you were talking down along the side of the train did you know or realize that you were in any danger in walking down in the direction toward the rear of the train? Ans.: I had no idea that I was anywhere near the rear of the platform, for the fact that those trains had stopped clear of the end of the platform."
The issues submitted to the jury and their answers thereto were as follows:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Ans.: `Yes.'
"2. Did the plaintiff, by his own negligence, contribute to his injuries alleged in the answer? Ans.: `Yes.'
"3. Did the plaintiff voluntarily assume the risk of injury as alleged in the answer? Ans.: `No.'
"4. What damage, if any, is the plaintiff entitled to recover? Ans.: `$37,500.'
"5. Was the plaintiff, at the time of his injury, engaged in interstate commerce? Ans.: `Yes.'
The court rendered judgment on the verdict. Defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.
This action was here before — Batton v. R. R. Co., 210 N.C. 756. There were two causes of action alleged by plaintiff in his complaint. (1) For personal injuries which the plaintiff suffered when he fell from a platform in the town of Weldon, N.C. while he was engaged in the performance of his duties as an employee of the defendant, and (2) for personal injuries which the plaintiff suffered after he had fallen from said platform.
The action was heard on defendant's demurrer to the second cause of action. The court, being of opinion that the facts stated in the complaint as constituting the second cause of action were not sufficient to *Page 264 
constitute a cause of action against the defendant, sustained the demurrer and dismissed the action as to said second cause of action. Plaintiff appealed to this Court.
This Court said, at p. 765: "In the instant case it is not alleged in the complaint that any of the employees of the defendant was present at the time the plaintiff fell from the platform at Weldon, or that the defendant had actual knowledge of the condition of the plaintiff as the result of his fall. Nor are facts alleged in the complaint from which it can be held that the defendant had constructive knowledge of such condition. . . . No facts are alleged in the complaint which imposed upon the defendant or its employees the duty to presume to the contrary. Conceding that if the defendant had known that the plaintiff had fallen from the platform at Weldon, and had suffered injuries which required immediate attention, medical or otherwise, the law would have imposed upon the defendant the duty to exercise reasonable diligence to provide such attention, we cannot hold that in the absence of such knowledge such duty was imposed upon the defendant. We therefore find no error in the judgment dismissing the second cause of action alleged in the complaint."
It is admitted, and found by the jury, that at the time of plaintiff's injury the defendant was engaged in interstate commerce. Therefore the action is governed by the Federal Employees' Liability Act. The decisions of the Federal courts control the State courts in all actions prosecuted in the State courts, but the rules of practice and procedure are governed by the laws of the State where the cases are pending.
In Hamilton v. R. R., 200 N.C. 543 (552-3-5), we find:
"The Second Federal Employers' Liability Act was held valid.223 U.S. 1, 56 L.Ed., 327. `The first section provides that every common carrier by railroad while engaged in interstate commerce shall be liable to every employee while employed by such carrier in such commerce or, in case of his death, to certain beneficiaries therein named, forsuch injury or death, resulting in whole or in part, from thenegligence of the carrier, or its employees, or by defectsor insufficiencies due to negligence in any of its equipmentsor property. The second section provides that every common carrier by railroad on lands of the United States other than states shall be liable in the same way to any of its employees. The third sectionprescribes that contributory negligence shall not bar recovery, but shallonly diminish the damages, except that no employee injured or killed wherethe violation of a safety law for employees contributed to the injury,shall be held to have been guilty of contributory negligence.' . . . (553)`Further prescribes that the jurisdiction of the courts of the UnitedStates under the act shall be concurrent with that of the courts of theseveral states, and no ease arising under the act *Page 265 
and brought in any State court of competent jurisdiction shall be removed to any court of the United States.' (Italics ours.) . . . (P. 555.) `The term "Negligence" has been defined by the National Supreme Court to be the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. The essence of the fault may lie in omission or commission. The duty is dictated and measured by the exigencies of the situation. Negligence has always relation to the circumstances in which one is placed, and what an ordinarily prudent man would do or omit in such circumstances. Charnock v. Texas R. R., Co.,194 U.S. 432, 49 L.Ed., 1057.' Roberts, supra (2 Fed. Lib. and Car. [2nd Ed.], 1929, sec. 811, pp. 1158-9). In Baltimore O. R. R. Co. v. Groeger, 266 U.S. at p. 24, we find: `The credibility of witnesses, the weight and probative value of evidence are to be determined by the jury and not by the judge. However, many decisions of this Court establish that, in every case, it is the duty of the judge to direct a verdict in favor of one of the parties when the testimony and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding.'"
The defendant made motions in the court below for judgment as in case of nonsuit at the close of plaintiff's evidence and at the close of all the evidence. C. S., 567. The court below overruled these motions, and in this we can see no error.
The following prayers for special instruction to the jury, requested by defendant, were properly refused by the court below: "(1) If you find the facts to be as testified to by all the witnesses, the court instructs you to answer the first issue `No.' (2) If you find the facts to be as testified to by all the witnesses, the court instructs you to answer the third issue `Yes.' (3) The court instructs you that the plaintiff's negligence was the sole and direct cause of his injury and you will, therefore, answer the first issue `No.'"
(1) Was there sufficient evidence to be submitted to the jury that plaintiff was injured by the negligence of the defendant, as alleged in the complaint? We think so.
In 2 Roberts Federal Liabilities Carriers (2nd Ed.), sec. 711, p. 1337, it is said: "The courts are agreed that the Federal Employers' Liability Act, being a humane and remedial statute, should invariably be given a liberal construction, to the end that the remedy proposed shall be advanced, and that the evil against which it was directed shall be corrected."
We set forth the evidence at length. All exceptions by the defendant to the competency of the evidence have been abandoned. The defendant *Page 266 
introduced no evidence. It is well settled by this and the Federal Court that the evidence must be taken in the light most favorable to the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.
The plaintiff, a flagman, had certain positive and important duties to perform at Weldon, when the train stopped there, to protect his employer. The train on this occasion had 19 cars, though it usually carried 17. The engineer knew this. The rear car was a private car, fastened by a Yale lock on the inside. The engineer had always theretofore cleared the railroad trestle, which was some 60 feet high. The custom was to stop on the platform. On this occasion he neglected to do so. He knew the flagman's duties when he stopped at Weldon — they were defined in the rules and regulations of the railroad company as follows: "Flagman must take care of the markers and other rear train signals, put them in place, see that they are properly displayed and that the signal lamps are clean, trimmed, burning brightly and that the markers are kept adjusted to the track." It was a dark and rainy night. There were no lights at the rear of the platform at all for some 5, 6, or 7 car-lengths. The lights were only where the passengers got off near the station; this was about 1,000 feet from the northern end of the platform. Plaintiff got off the train to do his duty. He walked along the platform inspecting the train, to adjust the markers and blow out the steam. There was no barricade or anything indicating that it was the end of the platform, and while walking along, actually engaged in inspecting the two cars, with a lantern intended for the purpose of giving signals and not capable of illuminating his surroundings, with no idea that he was anywhere near the end of the platform, he fell some 60 feet. The space of three feet at the end of the platform was altogether unprotected, entirely open. This is the space adjacent to and alongside the train. There was no obstacle of any kind to impede his progress or to stop him until he got to the northern end of the platform, and then, proceeding in the line of the duty, he fell off the end of the platform. It was incumbent on plaintiff to take care of the markers and rear train signals. On this occasion one of the markers was twisted around, and to adjust this and perform the other duties required of him under the rules, he proceeded on, without warning, and was injured.
In Jamison v. Encarnacion, 281 U.S. 635 (641), 74 Law Ed., 1082
(1085-6), it is written: "The act is not to be narrowed by refined reasoning or for the sake of giving `negligence' a technically restricted meaning. It is to be construed liberally to fulfill the purposes for which it was enacted, and to that end the word may be read to include all the meanings given to it be courts and within the word as ordinarily used.Miller v. Robertson, 266 U.S. 243, 248, 250, 69 Law Ed., 265, 271, 272,45 Sup. Ct. Rep., 73." *Page 267 
In 18 R. C. L., "Master and Servant," sec. 95, pp. 593, 594, 595, is the following: "Although the doctrine has met with some opposition, the courts have generally held that an employer owes to his employees a duty to make safe the place where they are required to perform their services, failing in which he renders himself liable to an employee who may sustain injuries as the proximate result of his neglect. In this respect as in others, the employer is not liable as an insurer, but is bound only to the exercise of ordinary or reasonable care, the degree depending upon the dangers attending the employment, and the standard being the care exercised by prudent employers under similar circumstances. This duty of the employer is affirmative and continuing, and it cannot be delegated to another so as to relieve the employer of liability in case of nonperformance. The dangers to which the employer's duty extends are all such as are latent and concealed, and hence beyond the knowledge of the employee. To discover such dangers, the employer must make proper tests and inspections, and after ascertaining their existence he must, as a rule, give the employee warning thereof. The employee may assume that the employer has discharged this duty, and no obligation rests upon him to make inspections with a view to discovering latent perils. Whether in any particular case the employer has discharged his duty in this respect is ordinarily a question for the jury's determination." Highfill v. Mills Co., 206 N.C. 582 (585-6); Riggs v.Mfg. Co., 190 N.C. 256.
We think the evidence sufficient to be submitted to the jury on the issue of negligence. The court below charged clearly the law of negligence applicable to the facts on this issue and proximate cause, to which no exception was taken.
(2) The question of contributory negligence is out of the picture. The answer to that issue was "Yes." The court below charged the rule as to diminished damage, to which no exception was taken.
(3) Did the plaintiff voluntarily assume the risk of injury as alleged in the answer? The jury answered "No." We see no error on this issue.
"A servant does not assume the extraordinary and unusual risks of the employment, and he does not assume the risks which would not have existed if the employer had fulfilled his contractual duties. But only those risks are assumed which the employment involves after the employer has done everything that he is bound to do for the purpose of securing the safety of his servants, that is, he does not assume the risk of injury from the negligence of the master." Richey, Federal Employers' Liability Act (2nd Ed.), p. 179; Pyatt v. R. R., 199 N.C. at p. 404; Hamilton v. R. R.,supra, at p. 561.
This question of assumption of risk is fully set out in Cobia v. R. R.,188 N.C. 487 (491), as follows: "By the common law the employee *Page 268 
assumes the risks normally incident to the occupation in which he voluntarily engages; other and extraordinary risks and those due to the employer's negligence he does not assume until made aware of them, or until they become so obvious and immediately dangerous that an ordinary prudent man would observe and appreciate them, citing N. Y. C. R. R. Co. v. White,238 U.S. 507; Seaboard v. Horton, 233 U.S. 492; Gila Valley, etc. R. R.v. Hall, 232 U.S. 94; Gaddy v. R. R., 175 N.C. 515."
The principles of law governing the submission of the issue of assumption of risk to the jury are also stated in Cobia's case, supra, at p. 491, as follows: "In a clear case the question of assumption of risk by the employee is one of law for the court, but where there is doubt as to the facts or as to the inferences to be drawn from them, it becomes a question for the jury. To preclude a recovery on that ground it must appear that the employee knew and appreciated, or should have known and appreciated the danger to which he was exposed, and in case of doubt, that is for the jury. . . . The burden of proof as to the assumption of risk is upon the defendant; and where there is any doubt as to the facts, or inference to be drawn from them, the question is for the jury."
In the case of Hamilton v. R. R., supra, certiorari denied,284 U.S. 636, the court, recognizing departure from the usual practice as a basis of liability, said, at p. 584: "There was evidence to the effect that the Southern, earlier that was customary, went to the `exchange track' to get a car which, in the exercise of due care, it knew or ought to have known as being repaired, and in making the repair plaintiff would of necessity be under the car; it gave no warning before picking up the crippled car by ringing a bell or sounding a whistle; it coupled with unusual and unnecessary force; it did not, as was the custom, stop the train beforecoupling, and a member of the crew get on the ground and look around and see if the car was ready to be moved; it had no right under the Safety Appliance Act to handle a crippled car." (Italics ours.)
The charge of the court below on assumption of risk has abundant authorities to support it. For example, the following portions of the charge are supported almost word for word in the cases: "Assumption of risk is founded upon knowledge of the employee, either actual or constructive, of the risks and hazards to the encountered in the performance of his duties and his consent to take the chance of injury therefrom. It is based upon the contract of employment and is distinguished from contributory negligence, which is solely a matter of conduct." See Horton v. R. R., 175 N.C. at p. 475, quoting from Labatt, Master and Servant, secs. 305, 306. "Under the law the employee assumes the risk *Page 269 
normally incident to the occupation in which he voluntarily engages, except those which are extraordinary or which are due to the master's negligence." See Pyatt v. R. R., 199 N.C. at p. 404, and Hamilton v. R. R., supra, at p. 561, both quoting from Richey, Federal Employers' Liability Act (2nd Ed.), at p. 179. "Extraordinary risks, and those which are due to the negligence of the employer, are not assumed by the employee until he is made aware of them, or until they become so apparent and obvious that any person of ordinary care and prudence could not fail to observe them." SeeMaulden v. Chair Co., 196 N.C. at pp. 124, 125; Pyatt v. R. R., supra, 405, 406. "In either case, or both, if he continues in the work without objection or protest, or without obtaining from the employer an assurance that the danger will be remedied or removed, he is deemed to have assumed them, and he takes the risk upon himself. If the dangers incident to the employment be so imminent and so apparent that no man of ordinary prudence would continue to rely upon such promises of the employer to remedy them under the circumstances, then he is deemed, to have assumed the risks even pending the performance of the promise." See Seaboard v. Horton, supra, 239 U.S., at pp. 597, 602, affirming Horton v. Seaboard, supra,169 N.C. 109.
The judge's charge fairly and adequately stated the doctrine of assumption or risk as it has developed to date since its first recognition in England in 1837 (Priestly v. Fowler, 3 M. W., 1), its transfer to America prior to the War Between the States (in 1841 — Murray v. R.R., 22 S.C. 385, in 1843 — Farwell v. R. R., 45 Mass. 49, citing both the Priestly and the Murray cases), and its definite acceptance in North Carolina by the turn of the century (Turner v. Lumber Co., 119 N.C. at pp. 398, 399; Smith v. R. R., 129 N.C. at p. 177). At first the doctrine was, at times, confused with the doctrine of contributory negligence (Rittenhouse v. R. R., 120 N.C. 544), but having drawn the line between the two doctrines in Thomas v. R. R., 129 N.C. 392, this Court inked in the doctrine and indicated its general limits in Hicks v.Mfg. Co., 138 N.C. at p. 327, where the Pennsylvania interpretation of the doctrine was accepted as stated in Patterson v. Pittsburgh, 76 Pa. St., 389. The doctrine reached the full flower of growth with the first of the two Horton cases, supra, in the decision of this Court (169 N.C. 109), and those of the United States Supreme Court (233 U.S. 492, and239 U.S. 595). More recent cases have amplified the definitions and corollaries of the doctrine and traced in many of the refinements of the doctrine. Among the leading cases on the subject in this jurisdiction in more recent years are: Pyatt's case, supra; Hamilton's case, supra284 U.S. 636), certiorari to U.S. Supreme Court denied, and Hubbardv. R. R., 203 N.C. 675. *Page 270 
The Federal Employers' Liability Act, being a humane and remedial statute, should be liberally construed. The assumption of risk as a defense to the recovery of damages had its origin in judicial decisions and may be properly classified as judge-made law. Congress and legislative bodies, from time to time, have endeavored to relieve employees who have suffered injuries from this defense. The trend of legislative action and judicial decisions in modern times, except in rare cases, is that this defense works injustice to employees.
"If the dangers incident to the employment be so imminent and so apparent that no man of ordinary prudence would continue to rely upon such promises of the employer to remedy them under the circumstances, the he is deemed to have assumed the risks even pending the performance of the promise." Seaboard v. Horton, supra.
It was for the jury to say, under the facts and circumstances of this case, where the plaintiff assumed the risk. Plaintiff was bound to examine the markers, etc., and go to the rear of the car to see that the lights were properly burning in accordance with the rules. The place to do this was made dangerous by the cars, contrary to custom, stopping over the trestle — unknown to plaintiff. There was nothing to warn him in the performance of a positive duty. No guards, no lights, no platform to walk on to reach the rear of the train to see the tail lights, nothing to put him on notice. This is plaintiff's view and the jury has so found.
The only exception and assignment of error made by the defendant to the charge: "Now, gentlemen of the jury, if you find from the evidence and by its greater weight, remembering the burden is on the defendant, that the plaintiff knew and understood for a long period of time that this bridge or platform constituted a dangerous situation, and he passed over it a number of times each month for a period of years, and that he continued in the employment of the defendant while fully aware of the dangers, if you find that it was dangerous, and that he continued in the employment of the company, doing the same class of work, following this same train or a similar train, stopping at this same place, then he would be chargeable with knowledge, of course, of the dangers which he himself testified existed, and under the circumstances it would be your duty to find as a fact that he did assume the risk of his employment and answer this issue `Yes'; if you find by the greater weight of the evidence." This exception and assignment of error cannot be sustained. Taking this with the prior parts of the charge, we cannot hold it for error.
This case is distinguishable from C. O. Ry. Co. v. Niham,280 U.S. 102, 74 L.Ed., 207; B. O. R. R. v. Bray, 286 U.S. 272-276,76 L.Ed., 272; Howell v. R. R., 211 N.C. 297. *Page 271 
We think this case similar in many respects to Inge v. R. R.,192 N.C. 522, where the authorities are fully set forth. Certiorari
denied by the Supreme Court of the United States, 273 U.S. 753.
The charge of the court below defined negligence, proximate cause, assumption of risk; properly placed the burden of proof and applied the law applicable to the facts. No exception was taken to any part of the charge except that above set forth. The concluding part of the charge cannot be bettered: "About the best guide that I have ever known for the government of a jury or a judge, or anybody else in passing upon questions which arise between individuals, or between corporations and individuals, and which I will give to you as my parting injunction is: `Ye shall do no unrighteousness in judgment; thou shall not respect the person of the poor, nor honour the person of the mighty: but in righteousness shalt thou judge thy neighbour' (Lev. 19:15)."
For the reason given we find
No error.