This action is brought under the Federal Employer's Liability Act to recover damages for a personal injury which the plaintiff alleges he sustained through the negligence of the defendant while he was employed as a yard clerk and engaged in the duty of checking freight cars in defendant's yard in Winston-Salem. That the plaintiff was an employee, engaged in interstate commerce, is admitted.
Summarizing from the evidence the facts bearing upon the appeal, the following are pertinent:
There are two freight yards with which the evidence is concerned — the lower yard, some distance to the west, and the Salem yard, in which the accident occurred. The Salem yard and its vicinage are typical of the usual freight yard, with tracks laid out and connected by switches so as to facilitate operations necessary to the breaking up of incoming trains, distributing the cars which compose them to their proper places to be unloaded or rehandled, and the making up of outgoing trains, or reassembly of cars in their proper order therein. Parts of trains handled together have been referred to as "strings" or "cuts," and with engine attached, "trains." Looking across the yard, there are eleven of such tracks, in fairly close proximity to each other, exclusive of the outside passenger track. The "lead" line connecting with the main freight line or "feed" line makes a continuous passage through the yards and is known as the switching line, because the several tracks above mentioned *Page 369 
branch off from it or from other tracks with which it is connected. This "switching lead," sometimes called the freight main line, is used as the main line from the lower yard to the Salem yard. Coming from the lower yard, it is connected with track No. 1, and this, in turn, by switch with track No. 2. All of the tracks, except the passenger track just mentioned, converge into the main freight line or feed line to the east.
The switches were equipped with the usual targets, automatically moved when the switch is changed, so as to show by means of colors whether the switch is lined up to let traffic into the track.
On the day of the accident, a crew — designated as the 3 o'clock crew — was engaged in taking cars out of the track further east in the yard and bringing them westwardly into the scales track to be weighed, with a view to putting them somewhere else in the yard. This required plaintiff to be on hand and conveniently stationed in the yard to check these cars as they passed against a switch list with which he had been supplied. These cars would pass over the scales track to be weighed and the tonnage noted by the plaintiff. He had been informed by Samuel, the Yardmaster, that a cut of cars would come in from the lower yard some distance west from the Norfolk Western connection, but he did not know when. Neither of these movements was scheduled for a particular time.
Plaintiff went into the yard to a point somewhere between tracks Nos. 2 and 3, prepared to check the cars handled by the 3 o'clock crew coming from the east. This train came in on the scales track, pulled by an engine, and plaintiff proceeded to check the cars as they passed. While so engaged, the train or cut of 30 cars, pushed by an engine and coming from the west, was let into the yard by the Yardmaster, Samuel, over a switch leading it into track No. 2, and proceeded on the latter track toward the train approaching in the opposite direction from the west, which plaintiff was checking. The string or cut of 30 cars coming from the west, and designated by the witnesses as a train, was pushed by an engine, and was in continuous movement from the lower yard to and into the Salem yard and until it came into contact with plaintiff.
At that time plaintiff was standing between tracks No. 2 and No. 3, or between the rails of track No. 2. His own testimony is to the effect that he was standing between tracks No. 2 and No. 3, and a little nearer track No. 2. He was busy with the checking of the cars in the train coming from the east and had his back to the train approaching from the west, when he was knocked down by the lead car, several cars passing over his leg and practically severing the foot above the ankle.
There is evidence tending to show that it was customary for the engineer to blow four blasts of a whistle before entering the Salem yard with such a train; and while the evidence is conflicting on this point, there is evidence tending to show that this signal was not given. There was no *Page 370 
head brakeman or other brakeman upon the lead car of the cut of 30 being pushed into the Salem yard. There were brakemen upon the train, one about half way its length and the other on the second car from the engine. The brakeman riding the car near the middle of the train had gotten down at some point near the switch to No. 2 track, and the remaining brakeman testified that from his position he could not see the plaintiff at the time the forward car struck him, nor could he see the engine which was pulling the train coming from the east. He states that his attention had been attracted by Mr. Samuel, Mr. Byrd and Mr. Baker — Mr. Byrd and Mr. Baker had gotten off the train — who were in conversation near the tracks, and that he finally got a signal which he calls a "wash-out" signal, or emergency signal, from a crew member of the other train, in consequence of which the train which hit plaintiff was signed down.
S. G. Hardister, fireman on the train operated by the 3 o'clock crew — that is, the train on the lead track headed west — saw the cut of 30 cars coming down-grade while his train was going up-grade, making steam. The 30 car cut was being shoved eastwardly into the yard and there was no brakeman or trainman on the front of the leading car. Hardister testified that he saw plaintiff a minute or two before the train struck him, but did not actually see it strike him, and that he was then standing between the rails of No. 2 track. At an exclamation from the engineer, "They've run over Eddie," Hardister jumped down off the train and pulled plaintiff clear of the track. This witness saw Mr. Wilkinson, a member of the 3 o'clock crew, trying to stop the train operated by the 4 o'clock crew by giving a "wash-out" or emergency signal. "The engineer and fireman of the 4 o'clock crew could not see the end of their train as it was being shoved into Salem yard because of thirty cars around a curve."
The plaintiff testified that there was much noise at that point in the yard; that the westward bound train was going up-grade and making steam, and that the eastbound train being pushed into the yard was going down-grade and coasting.
The plaintiff introduced certain rules from the Rule Book of the company, as follows:
Rule No. 103: "When cars are pushed by an engine, except when shifting or making up trains in yards, a trainman must take a conspicuous position on the front of the leading car."
"NOTE: The exception covers the making and breaking of trains only, and not extended movements within yards."
Rule No. 1311: "When a person or animal appears upon or so close to the track as to be in danger of being oblivious to the danger, he must immediately sound the alarm whistle; if, on approaching nearer, the *Page 371 
person or animal appears still unaware of the approach of the train and an accident is imminent, the engineer must use all means possible to warn the person or animal and to stop the train to avoid accident. If an inanimate obstruction is on or near the track, the train must be stopped before reaching it."
Rule No. 1321: "They must require forward brakemen to take proper positions on the train, whenever it is necessary."
Bearing upon these rules, the plaintiff offered the testimony of a number of experienced railway employees, some of them employees of the defendant of 19 or 20 years standing, who testified that they were familiar with Rule 103, and proceeded to interpret it according to its general understanding and usage among railway men. This evidence tended to show that the movement of the train by the 4 o'clock crew from the lower yard into the Salem yard and within the Salem yard was an "extended movement" within the rule. There is further testimony to the effect that such an extended movement ended only when the engine was uncoupled from the cars.
Further bearing upon the rule, the evidence tended to show that the 4 o'clock crew which brought this cut of cars in from the lower yard had no further duties with respect to it after placing the "cut" in its designated position in the yard; and that it would then be taken by a different crew and worked — that is, broken up, and the cars distributed or reassembled in other trains as might be convenient.
It was elicited from the plaintiff on cross-examination that he knew of the custom for the brakemen to dismount from the train some 40 or 50 feet after passing the switch point, but plaintiff did not regard that custom as applying to a movement of this kind. His testimony on this point is as follows:
"I knew all the operations of the yard and in and about the yard. It was not the custom on trains being pushed into Salem yard for the head brakeman, that is, the brakeman on the lead car, to get off of the car at the switch when the cut of cars entered Salem yard. The brakeman generally rode the car a little piece down into the tracks to see if everything was clear. By a little piece, I would mean 40 or 50 feet from the switch point. As to whether or not it was the custom for the head brakeman to get off the cars at from 40 to 50 feet from the switch as the cut of cars entered Salem yard, I would say it depends on how many cars there were in the cut. If it was a pretty long cut they would have to ride them down there and tie some hand brakes on the car. Thirty cars is a long cut. It was not the custom with respect to a cut of 30 cars for the head brakeman to get off 40 or 50 feet from the switch when the cut of cars entered Salem yard. I just finished saying, `No, it was not at the switch, but it was the custom to get off 40 or 50 feet beyond *Page 372 
the switch.' That is the custom, according to what switch you are going to shove into. There is not one custom about one switch and another custom about another switch, unless the cut of cars has got air coupled on. This train had air connected up. The custom was when I got hurt for the head brakeman to get off 40 or 50 feet from the switch that the train was being shoved into if air was connected on the train. I knew that was the custom. That had been the custom up to the time I got hurt. It was the custom to my knowledge."
Plaintiff testified that at the time of his injury, he was standing between tracks Nos. 2 and 3, about 150 feet east of the switch from No. 1 track into No. 2 track, and that if there had been a brakeman on the lead car, he could have seen plaintiff.
The plaintiff testified that it was not customary to admit cars coming from the lower yard and the N. W. connection to No. 2 and No. 1 tracks, since, generally, they were placed elsewhere, and that while the tracks in which they were usually placed were temporarily blocked by the advancing train in charge of the 3 o'clock crew, that these tracks would have been cleared in a few minutes when the train had gotten upon the scales track.
There was extended evidence with regard to the nature of plaintiff's injury and the necessity of two amputations below the knee.
Plaintiff took a voluntary nonsuit as to the defendant Samuel.
At the conclusion of the plaintiff's evidence, the defendant offering none, the defendant demurred to the evidence and moved for judgment as of nonsuit, which motion was overruled, and defendant excepted.
The plaintiff excepted to the following instructions given to the jury:
(1) "The Court instructs you that the testimony bearing upon this issue having come from the plaintiff and his witnesses, and as to whether or not he was contributorily negligent in bringing about his alleged injuries depends upon this testimony, if you find that the plaintiff himself has told the truth and you find by the greater weight of the evidence the facts to be as testified to by him, then the Court charges you as a matter of law that he was guilty of contributory negligence, and it would be your duty to answer the second issue submitted to you `Yes.'"
(2) "In addition to the rules already given to you, the Court charges you that if you should find in answer to the second issue, which the Court has heretofore instructed you to answer `Yes,' that the plaintiff by his own negligence contributed to his injury, then you would diminish the amount of damages you would otherwise award, if you come to this issue, according to the rule which the Court will now give you. Under the statutes it is not a question of majority of negligence, but rather one of proportion, and the damages are to be diminished in proportion to the amount of negligence attributable to the negligence of the plaintiff as *Page 373 
compared with the combined negligence of the plaintiff and the defendant, or to be more explicit, if you find from the evidence, as the Court has instructed you, and by its greater weight, that the plaintiff was guilty of contributory negligence, the Federal Employer's Liability Act provides that such contributory negligence is not to defeat a recovery altogether, but that damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee, it being the purpose of the statute to abrogate the common law rule, completely exonerating the defendant from liability in such a case, and to substitute a new rule, confining the exoneration to a proportional part of the damages, corresponding to the amount of negligence attributable to the plaintiff. The rule in this class of cases being that if the employer and the employee are both guilty of negligence, then the damages which the plaintiff is entitled to recover are to be diminished in the same proportion that his negligence bears to the combined negligence of the employer and employee. To state it differently, if the plaintiff and the defendant should be found by you to be guilty of negligence in an equal degree, and that the negligence of both the defendant and the plaintiff contributed to the injury in an equal degree, the jury may reduce the damages one-half. Or, if it should be found that the employee was guilty of more negligence than the employer, then the damages should be diminished more than one-half. Or, if it should be found that the employee is guilty of less negligence than the employer, then the damages should not be reduced as much as one-half. In other words, the amount which the plaintiff may recover if the plaintiff has been guilty of negligence, is to bear the same ratio or proportion to the full amount of damages sustained as the negligence attributable to the defendant bears to the combined negligence of the defendant and the plaintiff."
The following issues were submitted to the jury and answered as indicated:
"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: `Yes.'
"2. Did the plaintiff by his own negligence contribute to his injury, as alleged in the answer? Answer: `Yes.'
"3. Did the plaintiff assume the risk of his injury, as alleged in the answer? Answer: `No.'
"4. What amount of damages, if any, is the plaintiff entitled to recover? Answer: `8,500.'"
From the judgment rendered upon the verdict, both plaintiff and defendant appealed, assigning error.
For an orderly consideration of the case, we may array the contentions of the parties on the two appeals substantially as follows:
Upon the facts as they appear, the defendant company contends that its demurrer to the evidence and motion for judgment as of nonsuit should have been allowed for a number of reasons. In the first place, it is contended that the evidence discloses no negligence on the part of defendant, since, as contended, safety rule No. 103 (see supra), upon which it is conceived plaintiff's case must wholly rest, does not apply to an employee such as plaintiff or to a movement of cars such as caused his injury; but, nevertheless, if it was meant so to apply, it had been abrogated by custom to plaintiff's knowledge. And that at any rate, the plaintiff assumed the risk resulting in his injury and that his action should have been dismissed on that ground. Pertinent to these contentions, the plaintiff advances a number of reasons why the defendant should be held for negligence. Amongst them are the violation of the rules — especially No. 103 — established by the company for the safety of its employees; the failure of the engineer of the 4 o'clock crew to blow a warning signal when shoving a thirty car train into the yard; the failure of the 3 o'clock crew, especially the engineer, to give an emergency signal when he saw that the trains were approaching each other and when plaintiff's position of peril was discovered.
PLAINTIFF'S APPEAL.
The power of the court to declare the conduct of the plaintiff contributorily negligent as a matter of law when only that inference can be drawn from the evidence by reasonable minds has long been recognized by the courts of this State. Neal v. R. R., 126 N.C. 634, 36 S.E. 117; Hayesv. Western Union Telegraph Co., 211 N.C. 192, 193, 189 S.E. 499; Godwinv. R. R., 220 N.C. 281. The rule is generally prevalent (see 38 Am. Jur., p. 1054, note 15), and we see nothing in the procedure offensive to a trial under the Federal Act.
Negligence is a mixed question of law and fact. Nichols v. FibreCo., 190 N.C. 1, 128 S.E. 471; Trustees of Elon College v. Banking Co.,182 N.C. 298, 109 S.E. 6; Jones v. American Warehouse Co., 138 N.C. 546,51 S.E. 106. When the question is resolved by elimination of the element of fact, it becomes one of law. The factual element can be determined by admission, a finding by the jury, or application of the single inference test to the evidence, taken in the light most favorable to the plaintiff.Reeves v. Staley, 220 N.C. 573; Luttrell v. Mineral Co., 220 N.C. 782.
The common law rule obtains in the state jurisdiction with respect to actions brought and tried under state laws, and in such an action the proximate contributory negligence of the plaintiff, however small the *Page 375 
contribution, will bar recovery, and justify the withdrawal of the case from the jury under the single inference rule when the evidence warrants it. The Federal Employer's Liability Act expressly departs from the common law rule and introduces a somewhat modified doctrine of comparative negligence under which contributory negligence is not a bar to recovery, but is taken into account on the quantum of damages. But it is still competent for the court, with due and proper consideration of the phases of the evidence bearing upon the point, to instruct the jury that if they find by the preponderance of the evidence the facts to be as the evidence tends to show, the conduct of the plaintiff would constitute contributory negligence and they should answer the pertinent issue accordingly. This is no more than a compliance with the duty of the court to apply the law to the evidence. The formula employed, if not offensive in other particulars, is not important. This exception of plaintiff cannot be sustained.
Plaintiff excepts to the instruction that the jury should take into consideration the contributory negligence of the plaintiff, if he should be found to be negligent, on the issue of damages, and diminish the award in proportion to the amount of negligence attributable to plaintiff. We assume that plaintiff excepted to this instruction in order to protect his position under the exception just considered. At any rate, the instruction given to the jury correctly applies the law under the Federal statute and in accordance with authoritative decisions. Raines v. R. R., 169 N.C. 186,85 S.E. 294; St. Louis S. F. R. Co. v. Brown, 241 U.S. 223,60 L.Ed., 936, Annotation 12 A.L.R., 705; Moore v. R. R., 185 N.C. 189,116 S.E. 409; Moore v. Iron Works, 183 N.C. 438, 111 S.E. 776; Davisv. R. R., 175 N.C. 648, 96 S.E. 41; Horton v. R. R., 157 N.C. 146,72 S.E. 958; Norfolk etc. R. Co. v. Earnest, 229 U.S. 114, 122,57 L.Ed., 1096.
DEFENDANT'S APPEAL.
In addition to his other designations of negligence, the plaintiff points out that if Rule 103 had been observed, and a brakeman posted in a conspicuous position on the lead car, plaintiff's injury could have been obviated by a mere call from the brakeman — certainly by proper warning or signal either to the plaintiff or others engaged in operating the train.
Numerous experienced railroad men, amongst them a number of the defendant's employees, who had served for periods of time up to 20 years or more, during which the rule had remained unchanged, testified that according to common usage and understanding of railroad men, the rule applied to movements of cars such as that from which the plaintiff received his injury. Also it may be inferred from the evidence that the operation of this train was one continuous extended movement from the *Page 376 
lower yard into and within the Salem yard by which the train of thirty cars was pushed into the Salem yard and into a track designated by Yardmaster Samuel; and that the string of cars was to be left there to be broken up by switching movements by another crew. There is no contradiction to the testimony that the duties of the 4 o'clock crew, which handled the "cut" from the lower yard, ended when the cars were so placed, and that the train was then turned over to another crew.
We think the rule upon its face is addressed to dangers and to the prevention of injuries in an area of operation into which the public generally had little cause to intrude, but in which the employees are peculiarly liable to injury if the proper precautions are not taken. Certainly, the public has nothing to do with the movement of cars in a freight yard, whether an "extended movement" or a "switching movement." We are of the opinion that the rule properly applies to employees of the company whose safety may be imperiled by its nonobservance, and that the plaintiff was within its intended protection.
There is some confusion in the testimony with regard to the extent to which the rule was observed or whether it had been abrogated by custom. The evidence, however, does not justify the conclusion as a matter of law that the rule had been abrogated by custom as to this particular movement of the train, and to the knowledge of plaintiff, and this question was properly left to the jury. We think upon the whole record, there is ample evidence from which the negligence of the defendant might be inferred.
We turn to defendant's contention that whatever negligence there was was covered by assumption of the risk. However, with reference to the rule we have been discussing, it is to be noted that defendant seems to concede that an employee does not ordinarily assume the risk of the violation by a fellow employee of a rule designed for his protection. We discuss briefly the question raised as to how far the doctrine of assumption of risk applies to the negligence of a fellow employee. Frankly, we think the fact that the injury arose from the negligence of a fellow servant, if it did so arise, has little to do with the application of the doctrine of assumption of risk as the law existed before the 1939 amendment below noted. Negligence of a fellow employee did not bar assumption of risk, but it did not aid it. The applicable principle is made clear in Reed v. DirectorGeneral of Railroads, 258 U.S. 92, 66 L.Ed., 480, in which the court interprets Seaboard A.L.R. Co. v. Horton, infra, and applies the rule as clarified:
"Seaboard Air Line R. Co. v. Horton — often followed — ruled that the Federal Employers' Liability Act did not wholly abolish the defense of assumption of risk as recognized and applied at common law. But the opinion distinctly states that the first section `has the effect of abolishing *Page 377 
in this class of cases the common-law rule that exempted the employer from responsibility for the negligence of a fellow employee of the plaintiff.' The Second Employers' Liability Cases (Mondou v. New York, N. H. H. R.Co.), 223 U.S. 1, 49, 56 L.Ed., 327, 345, 38 L.R.A. (N.S.), 44,32 Sup. Ct. Rep. 169, 1 N.C.C.A. 875, declared that `the rule of negligence of one employee, resulting in injury to another, was not to be attributed to their common employer, is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employee.' And in Chicago, R. I. P. R. Co. v.Ward, 252 U.S. 18, 64 L.Ed., 430, 40 Sup. Ct. Rep. 275, we said: `The Federal Employers' Liability Act places a co-employee's negligence, when it is the ground of the action, in the same relation as that of the employer upon the matter of assumption of risk.' See New York C. H. R. R. Co. v.Carr, 238 U.S. 260, 59 L.Ed., 1298, 35 Sup. Ct. Rep. 780, 9 N.C.C.A. 1; Chesapeake O. R. Co. v. DeAtley, 241 U.S. 310, 313, 60 L.Ed., 1016,1019, 36 Sup. Ct. Rep. 564."
The theory upon which the Act is held to modify the common law rule that exempted the employer from responsibility for the negligence of a fellow employee of the plaintiff is explained as follows: "To hold otherwise would conflict with the declaration of Congress that every common carrier by railroad, while engaging in interstate commerce, shall be liable to the personal representative of any employee killed while employed therein, when death results from the negligence of any of the officers, agents, or employees of such carriers."
Plaintiff was injured 7 July, 1939. About a month later — on 11 August, 1939 — the Act was amended by expressly providing that an employee within its terms was not to be deemed to have assumed the risk of injury by the negligence of officers, agents or employees of his employer, thus abrogating the doctrine of assumption of risk as applied to a fellow servant; but the plaintiff is at least entitled to the incidence of the law upon his case as commonly understood and interpreted at the time of his injury. As the law then stood, the defense of assumption of risk was available in an action involving negligence of a fellow servant, except as excluded expressly in the Act, assuming that the facts were sufficient to establish assumption of risk under the recognized rules pertaining to that doctrine. Moore v. Chesapeake O. R. Co., 291 U.S. 205, 78 L.Ed., 755;Chicago G. W. R. Co. v. Schendel, 267 U.S. 287, 69 L.Ed., 614; GreatNorthern R. Co. v. Donaldson, 246 U.S. 121, 62 L.Ed., 616; Seaboard AirLine R. Co. v. Horton, 239 U.S. 595, 60 L.Ed., 458.
In all these cases, the rule has been kept within the cardinal principle which limits the extent of the employee's undertaking under his contract *Page 378 
of employment; — that is, that he assumes only the ordinary risks of the employment, or those which are at the time obvious or known and appreciated.
This principle is aptly expressed in Cobia v. R. R., 188 N.C. 487, 491: "By the common law, the employee assumes the risks normally incident to the occupation in which he voluntarily engages; other and extraordinary risks and those due to the employer's negligence, he does not assume until made aware of them, or until they become so obvious and immediately dangerous that an ordinarily prudent man would observe and appreciate them."
In this case (Cobia v. R. R., supra), there is an enlightening discussion of this whole subject, and Chesapeake Ohio Ry. v. DeAtley, 241 U.S. 311,60 L.Ed., 1016, where the principle is applied under the Employer's Liability Act, is quoted with approval: "An employee is not bound to exercise care to discover extraordinary dangers arising from the negligence of the employer or of those for whose conduct the employer is responsible, but may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them." SeaboardAirline Railway v. Koenecke, Admr., 239 U.S. 352, 60 L.Ed., 324;Railroad v. Mangan, 278 F., 85.
In Covington v. R. R. (S.C.), 155 S.E. 438, the following definition of ordinary risk was quoted with approval from 39 C. J., 704, 705: "Risks and perils ordinarily incident to the employment are such as are to be expected from the particular character of the service in which the employee is engaged, and have generally been defined as those which remain after the master, or one rightly exercising the authority of the master, has exercised due care to prevent or avoid . . . which cannot be obviated or avoided by the exercise of due care on the part of the master." Reed v.Director General, supra; Railroad v. Ward, 252 U.S. 18, 64 L.Ed., 430;Railroad v. DeAtley, supra.
This agrees with the observation of the Court in Hamilton v. R. R.,200 N.C. 543, 158 S.E. 75: "The servant does not assume extraordinary and unusual risks of the employment, and he does not assume the risks which would not have existed if the employer had fulfilled his contractual duty."
Further quoting from Cobia v. R. R., supra: "The negligence of fellow-servants is withdrawn from the class of assumed risks in cases of unusual and instant negligence, and under circumstances which afforded the injured employee no opportunity to know of the conditions or appreciate the attendant dangers. This doctrine of assumption of risk is based *Page 379 
upon knowledge or a fair and reasonable opportunity to know, and usually this knowledge and opportunity must `come in time to be of use.'"
In Batton v. R. R., 212 N.C. 256, 193 S.E. 674, we find: "Assumption of risk is founded upon knowledge of the employee, either actual or constructive, of the risks or hazards to be encountered in the performance of his duty, and his consent to take the chance of injury therefrom. It is based upon the contract of employment and is distinguished from contributory negligence, which is solely a matter of conduct."
Authoritative decisions under the act make it clear, we think, that the employee does not assume the risk of unusual or extraordinary negligence or negligence presenting an unpredictable emergency, or one where the danger involved is not obvious or not known and appreciated.
Since it is apparent that not all negligent acts of a fellow servant come within the category of assumed risk, we think it would be taking a somewhat complacent view of the law to hold that the violation of a rule which is intended for the safety of employees, and obviously necessary or highly important in that respect, might be classed as ordinary negligence, or that the manner of its happening, as pictured in the evidence, is consistent with the theory of assumption of risk as defined or explained in the cited cases.
We are of the opinion that the court below took the proper course in submitting the evidence to the jury, with appropriate instructions, and defendant's motion was properly overruled.
We find no error on either appeal.
On plaintiff's appeal,
No error.
On defendant's appeal,
No error.